UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| SHERYL ELIZABETH GODWIN, | ) | Civil Action No.: 4:15-cv-1953-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **ORDER** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying Plaintiff's claim for disability insurance benefits (DIB) and social security

income (SSI).  The only issues before the Court are whether the findings of fact are supported by

substantial evidence and whether proper legal standards have been applied.

## I.  RELEVANT BACKGROUND

### A.    Procedural History

Plaintiff filed an application for DIB and SSI on September 28, 2010, alleging inability to

work since July 1, 2010. Her claims were denied initially and upon reconsideration. Thereafter,

Plaintiff filed a request for a hearing. A hearing was held on June 25, 2011, at which time the

Plaintiff and a vocational expert (VE) testified. The Administrative Law Judge (ALJ) issued an

unfavorable decision on February 17, 2012, finding that Plaintiff was not disabled within the

meaning of the Act. (Tr.10-19).  Plaintiff filed a request for review of the ALJ's decision, which the

Appeals Council denied on April 26, 2013, making the ALJ's decision the Commissioner's final

decision. Plaintiff filed an action in this court on June 6, 2013. While her case was pending, Plaintiff filed a second application for DIB on July 20, 2013, which was consolidated with her original claim. The Commissioner requested that this court remand Plaintiff's claim so that the ALJ could clarify whether Plaintiff's back and feet/ankle impairments were severe for a 12-month consecutive period; give further consideration to Plaintiff's maximum residual functional capacity; further evaluate Plaintiff's subjective complaints including side effects from medication; and obtain vocational expert testimony if warranted by the expanded record to clarify the demands of Plaintiff's past relevant work and/or the effect of Plaintiff's limitations on Plaintiff's occupational base. (Tr. 570-71).

The ALJ updated the medical records by obtaining a consultative psychological examination and gathering treatment records generated after the ALJ's first decision. (Tr. 808-1076). On November 20, 2014, the ALJ held an administrative hearing at which Plaintiff and a vocational expert testified. (Tr. 494-523). On February 27, 2015, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 473-84).

Plaintiff did not file exceptions to the ALJ's decision, and the Appeals Council declined to assume jurisdiction. Accordingly, the ALJ's February 27, 2015, decision became final on April 29, 2015, 61 days after the decision. (Tr. 471). See 20 C.F.R. §§ 404.984(d), 416.1484(d). Plaintiff filed the present action on May 8, 2015.

**B.    Plaintiff's Background and Medical History**

**1.    Introductory Facts**

Plaintiff was born on November 23, 1961, and was 48 years old at the time of the alleged onset. (Tr. 131). Plaintiff completed her education through high school and has past relevant work experience as an office manager and a courthouse clerk. (Tr. 27, 516). Plaintiff alleges disability due to fibromyalgia and arthritis. (Tr. 122-30, 145, 157).

2.    **Medical Records**[1]

Dr. J. Grant Taylor at Coastal Carolina Rheumatology treated the Plaintiff in October and November of 2002, for complaints of pain in her shoulders, arms, neck, and lower back. She complained of frequent night awakening and nonrestorative sleep, as well as exacerbation of pain with mild activities and weather changes. In October of 2002, she weighed 141 pounds. Upon examination, Dr. Taylor indicated that the Plaintiff had tenderness over both trapezius muscles, the lumbar and cervical paraspinal musculature, both biceps, and lateral epicondyles. Dr. Taylor felt that her symptoms suggested fibromyalgia. Dr. Taylor continued to treat the Plaintiff's symptoms of fibromyalgia in November of 2002, namely nonrestorative sleep due to pain, anxiety, and diffuse tenderness over her trapezius muscles, the cervical and lumbar paraspinal musculature, and over both greater trochanteric bursa. (Tr. 322-326)

Dr. Frank Harper at East Cooper Rheumatology began treatment of the Plaintiff in December of 2002, when she saw him for a second opinion regarding the diffuse muscle pain she was experiencing throughout her body, as well as sleeplessness, stiffness, chronic anxiety, and loss of appetite with pain. After examining her, Dr. Harper found exquisite tenderness to her paracervical musculature, trapezius muscles, periscapular areas, especially the medial scapular borders, the upper and mid back, the lower back especially around L4-5 extending down into the sacroiliac joint and gluteal areas bilaterally, bilateral lateral hips, medial knees, anterior chest wall, and anterior-lateral elbows. He felt that she had typical fibromyalgia syndrome with 18 of 18 of the classical trigger points, significant associated anxiety. (Tr. 465-66).

---

[1]A full discussion of Plaintiff's medical records is not included herein. A more thorough discussion of Plaintiff's numerous medical records is included in her Brief (Document # 17) at pp. 8-28.

Through the first few months of 2003, the Plaintiff's condition remained much the same with Dr. Harper identifying trigger points at each visit. Her trigger points were so diffuse in February of 2003, that he could not consider trigger point injections. By April of 2003, there was some improvement in her pain, and she was sleeping better, but she continued to have diffuse trigger points. On June 6, 2003, she reported pain and stiffness with the small joints of her hands, especially after yard work. Dr. Harper still noted multiple diffuse trigger points, and saw some bony enlargement and puffiness in her hand joints bilaterally. He diagnosed mild osteoarthritis of the hands with fibromyalgia syndrome. By July of 2003, the Plaintiff reported worsening of fibromyalgia symptoms, and Dr. Harper felt that the were almost back to square one in regard to trigger points and severe pain. In October of 2003, Dr. Harper had her fibromyalgia symptoms almost in remission, but the medication that helped the fibromyalgia, Zyprexa, had caused tremendous weight gain. When the Plaintiff returned to Dr. Harper on December 5, 2003, she had multiple trigger points, and he had to discontinue Zyprexa because she had gained an enormous amount of weight. With the medication change, when she returned to Dr. Harper on December 30, 2003, she had marked worsening of the fibromyalgia symptoms with trigger points in her trapezius muscles, periscapular areas, upper, mid and low back, and both lateral hips, as well as tenderness to her paracervical musculature. (Tr. 450-64).

Throughout the first half of 2004, the Plaintiff continued to suffer with diffuse pain with multiple trigger points. Dr. Harper indicated in July of 2004, that if she continued to gain weight on the Zyprexa, he would have to discontinue the drug, but previous attempts to do so had led to an exacerbation of the fibromyalgia symptoms. The Plaintiff continued treatment with Dr. Harper through 2004, and by March of 2005, she had voluntarily discontinued Zyprexa due to the large weight gain on that medication. She reported having increasing muscle pain and stiffness diffusely.

She still had multiple tender trigger points. (Tr. 434-466).

On April 29, 2005, Dr. Harper noted that the Plaintiff still had muscle pain, stiffness, and arthralgias of her hands. He found tender trigger points in the paracervical musculature, trapezius muscle, medial periscapular areas, lower back, and bilateral hips. Her hands had some puffiness in the joints. Dr. Harper felt that she was having problems from mild inflammatory osteoarthritis. Her condition remained much the same for 2005. On September 8, 2006, she reported that she had a cervical diskectomy for severe neck and shoulder discomfort, and after surgery, she had developed more severe muscle pain and stiffness in both upper and lower extremities, neck, lower back, and lateral hips. Dr. Harper identified multiple tender trigger points, and felt that she was experiencing worsening fibromyalgia symptoms associated with significant stress. (Tr. 426-433).

Dr. Harper did not see the Plaintiff again until May of 2009, when the Plaintiff described gradual progression of worsening muscle pain and stiffness. Dr. Harper's examination revealed exquisite tenderness of the Plaintiff's left shoulder with restriction of abduction, exquisite tenderness of the posterior scapular area, medial scapular border, and superior scapular area.  There was also mild rotator cuff tenderness and tenderness of the periscapular areas bilaterally and lateral hips bilaterally. Dr. Harper felt that she was extremely depressed and that her fibromyalgia was overlapping with anatomical joint pain and left shoulder disease. He gave her a tender point injection at the superior edge of the left scapula. In June of 2009, the Plaintiff reported some benefit from her new medication, Imipramine, but she still had multiple tender trigger points. (Tr. 422-425).

Dr. Frank Harper examined the Plaintiff on December 11, 2009, for fibromyalgia, esophageal reflux, inflammatory osteoarthritis, status post cervical diskectomy C6-7, left rotator cuff tear status post left rotator cuff surgical decompression and repair, irritable bowel syndrome. During this exam, Dr. Harper indicated that the Plaintiff had developed exquisite pain subsequent to her rotator cuff

surgery with a general worsening of fibromyalgia-related symptoms. He noted that she had tender points located in her paracervical musculature, the trapezius muscles bilaterally, the medial scapular borders, the lower back, gluteal and lateral hips bilaterally, with the exception of the left shoulder, with marked restriction of abduction to approximately ninety degrees, with exquisite tenderness around the shoulder, and exquisite tenderness of the medial scapular border and trapezius area. Dr. Harper also indicated that the Plaintiff was emotionally distraught and disappointed in her shoulder surgery outcome. Dr. Harper injected the tender point in her left trapezius area with Xylocaine and Depo-Medrol and increased her imipramine. On a prior visit before the left rotator cuff surgery, Dr. Harper had also found tender trigger points in the Plaintiff's paracervical musculature, trapezius muscle, medial periscapular areas, lower back and lateral hips bilaterally. She also had restricted range of motion in her left shoulder at that time, with exquisite tenderness of the rotator cuff area. Dr. Harper still found trigger points, despite the Plaintiff having good response to imipramine with a reduction in fibromyalgia symptoms overall. She continued to experience restless limbs in her arms and legs at night. When the Plaintiff returned to Dr. Harper on February 12, 2010, she continued to suffer from severe left shoulder pain, as well as tender points in her paracervical musculature, the bilateral trapezius muscles, the medial scapular borders, the lower back, and gluteal and lateral hips bilaterally. Dr. Harper again noted exquisite tenderness of the left posterior scapular area. Dr. Harper commented that the Plaintiff's condition was extremely complex, since she has elements of fibromyalgia, inflammatory arthritis, and adhesive capsulitis complicating the previous rotator cuff repair. He stated that she was markedly restricted and felt that the adhesive capsulitis was contributing substantially to pain down her anterior and posterior aspects of the shoulder, but he was clear that she has tender point phenomenon as well. He again injected the left shoulder in an effort to help with the pain. (Tr. 220-225).

-6-

On May 21, 2010, when Dr. Harper examined the Plaintiff, he found that she had tenderness of the paracervical musculature, the trapezius muscles, the medial scapular border areas, the upper back, L1-L5 bilaterally in the lower back, and the gluteal and lateral hip areas bilaterally. There was exquisite tenderness of the medial scapular borders bilaterally, so he injected those areas with Xylocaine and Depo-Medrol. He counseled the Plaintiff on the importance of stress management and noted that she was under considerable stress at work. He felt that she ultimately might have to retire from work for medical reasons. When the Plaintiff returned to Dr. Harper on June 2, 2010, she complained of diffuse myalgias, particularly in her neck, shoulders, and upper back. She reported that she was having difficulty sleeping and difficulty functioning in the workplace. During his physical examination, Dr. Harper again indicated that the Plaintiff had tenderness in her paracervical musculature, trapezius muscles, medial scapular border areas, the upper back, the lower back L1-L5 bilaterally, and the gluteal and lateral hip areas bilaterally. During this visit, he suggested that the Plaintiff leave the workplace and file for social security benefits since she had failed numerous therapies and he was convinced that she would not be able to carry on in the workplace. In July of 2010, Dr. Harper stated that the Plaintiff still had tenderness to the same areas of her body, and she had exquisite tenderness of her lower back, L1-L5 on the right. When the Plaintiff returned to Dr. Harper on August 20, 2010, she had developed severe left heel pain, especially on weightbearing. She continued to complain of diffuse muscle pain, stiffness, and fatigue. She continued to experience tenderness in the same areas of her body, and Dr. Harper indicated exquisite tenderness of the left plantar heel pad. At this visit, Dr. Harper expressed serious concern about the Plaintiff's weight (205 pounds at this visit) since he felt that it was causing significant lower extremity problems, and he urged weight loss. He again felt that her pain and other symptoms stemmed from fibromyalgia and inflammatory osteoarthritis. (Tr. 210-218).

When the Plaintiff returned to Dr. Harper on October 20, 2010, he found that she still had diffuse pain, stiffness, and fatigue with worsening bilateral heel pain. His examination of the Plaintiff once again showed multiple areas of tenderness. On December 29, 2010, Dr. Harper noted that the Plaintiff was experiencing substantial breakthrough pain after beginning chiropractic physiotherapy, as recommended by Dr. Harper in a previous visit. She still had tenderness to her paracervical musculature, the trapezius muscles, the medial scapular border areas, the upper back, the lower back L1-L5 bilaterally, and the gluteal and lateral hip areas bilaterally. Dr. Harper recommended continuation of the chiropractic physiotherapy and continued weight reduction, and he prescribed Hydrocodone for the severe breakthrough pain.  (Tr.418-421).

On February 24, 2011, Dr. Frank Harper examined the Plaintiff and indicated she had bilateral heel pain, as well as tenderness of the paracervical musculature, the trapezius muscles, the medial scapular border areas, the upper back, the lower back L1-L5 bilaterally, and gluteal and lateral hip areas bilaterally. He noted exquisite tenderness of the chest wall and four areas, including two symmetrically in the lower ribs and two symmetrically at the second intercostal space, midclavicular line bilaterally. The Plaintiff also reported a very upsetting recent disability exam that Dr. Harper felt contributed to her fibromyalgia flare. He also stated that her chest wall pain was severe enough to cause restriction of the chest wall movement. He prescribed Lidoderm patches for her pain and again strongly recommended weight loss due to her heel pain.  On May 2, 2011, Dr. Harper opined that the Plaintiff suffered from depression and anxiety for which she was prescribed Xanax XR. He further felt that she had depressed mood/affect, poor concentration and memory, and she had obvious work-related limitation of function due to her mental condition. (Tr. 276-278).

On May 5, 2011, Dr. Frank Harper noted that the Plaintiff continued to experience diffuse muscle pain, stiffness, bilateral plantar heel pain, and right shoulder pain with abduction and

extension. During the examination, Dr. Harper found tenderness of the paracervical musculature, the trapezius muscles, the medial scapular border areas, the upper back, the lower back L1-L5 bilaterally, and gluteal and lateral hip areas bilaterally. Dr. Harper indicated that the Plaintiff had exquisite tenderness of the posterior aspect of the right rotator cuff area and tenderness of the bilateral plantar heels. He again urged the Plaintiff to lose weight to help with her heel pain, he prescribed Xanax for fibromyalgia-related symptoms, and he injected her right shoulder with a combination of Xylocaine and Depo-Medrol. Dr. Harper treated the Plaintiff on July 21, 2011, for muscle pain, stiffness, and fatigue. At that time, the Plaintiff said that she had lost eleven pounds since her previous visit, but her low back pain had continued to be severe. After finding tenderness to the Plaintiff's paracervical musculature, the trapezius muscles, the medial scapular border areas, the upper back, the lower back from L1 to L5 bilaterally, the bilateral gluteal and lateral hip areas, and especially exquisite tenderness at L4-5 bilaterally, Dr. Harper injected two tender points in the Plaintiff's lower back with Xylocaine and Depo-Medrol. (Tr. 316-317, 416-417).

On September 30, 2011, the Plaintiff reported to Dr. Harper that she had been receiving epidural steroid injections from Dr. Poletti for increasing low back pain. She also reported continued muscle pain, stiffness, and persistent fatigue. Dr. Harper again found tenderness in multiple body areas, noting exquisite tenderness of her left lateral hip and flank. Dr. Harper indicated that the Plaintiff's fibromyalgia was complicating the nerve root compression at L4-5. The Plaintiff had continued to lose weight, which he felt would ultimately help her back pain. (Tr. 412-413).

The Plaintiff was again examined by Dr. Harper on November 22, 2011, at which time she reported persistent myalgias, stiffness and fatigue, bilateral medial knee pain that was difficult to tolerate, and restless sleep at night. Dr. Harper noted that there was tenderness of the paracervical musculature, trapezius muscles, medial scapular areas, the upper back, the lower back L1 to L5

bilaterally, and gluteal and lateral hip areas bilaterally. Dr. Harper also described exquisite tenderness of the medial knees bilaterally, and he stated that she had notorious difficulty tolerating drug therapies in the past. He felt that her medial knee pain was typical of fibromyalgia. When the Plaintiff returned to Dr. Harper on January 26, 2012, she reported continued excruciating medial knee pain, as well as restriction of activity and diffuse myalgias, stiffness, and fatigue. Dr. Harper found tenderness to the same areas that he found in November of 2011, and he indicated exquisite tenderness of the anserine bursa of the right knee. He felt that the Plaintiff had an element of osteoarthritis of the knees. He stated that the Plaintiff's fibromyalgia was prominent with significant chronic fatigue. She had also experienced weight gain. Dr. Harper recognized that the Plaintiff was under the care of Dr. Stephen Poletti for neck pain. Dr. Harper injected the Plaintiff's right knee with Xylocaine and Depo-Medrol. On March 28, 2012, when Dr. Harper once again examined the Plaintiff, she reported that an increase in Xanax to twice daily seemed to be beneficial, she continued to have diffuse myalgias, persistent left lateral hip pain, and a worsening of right knee pain. Her tender points remained consistent with the examinations from November 2011, and January 2012, and Dr. Harper described exquisite tenderness of the left lateral hip and right knee anserine bursa. Dr. Harper also counseled the Plaintiff since she was distraught during his examination, particularly over her traumatic disability hearing and subsequent denial. Dr. Harper reiterated that the Plaintiff had active fibromyalgia, inflammatory osteoarthritis, and recurring right anserine bursitis. Dr. Harper increased the Plaintiff's Xanax to twice daily and prescribed a Prednisone Dosepak. In May of 2012, the Plaintiff told Dr. Harper that her symptoms of pain, stiffness and fatigue were unimproved, and she continued to have worsening right knee pain and intermittent right elbow pain. She had also gained more weight. On July 18, 2012, the Plaintiff indicated that there had been no improvement in her symptoms, other than a three-pound weight loss. Dr. Harper's examination revealed the same

tender points, and he stated that ultrasound images confirmed likely osteoarthritis of the right knee compatible with recurring medial knee pain, most likely anserine bursitis. (Tr. 916-924).

On October 17, 2012, when Dr. Harper examined the Plaintiff, she had recently been released from her hospitalization, and Dr. Harper noted that she had lost 23 pounds and subsequent to her hospitalization, she had a severe flare of fibromyalgia and migraine headaches. On December 19, 2012, the Plaintiff's condition had not improved, and she had developed abdominal problems and a fistula. Dr. Harper was concerned that she had inflammatory bowel disease with associated fistula. Dr. Harper noted on March 27, 2013, that the Plaintiff had continued right elbow and arm pain, lateral hip pain bilaterally, the same multiple tender points, restricted range of motion of the right shoulder, and exquisite tenderness of the tender point in the distal triceps area. Dr. Harper stated that the Plaintiff had a curious composite of symptoms which were related to fibromyalgia, and he injected the right triceps tender point with Xylocaine and Depo-Medrol. (Tr. 910-915).

The Plaintiff returned to Dr. Frank Harper on June 20, 2013, with a recurrence of right elbow pain, diffuse myalgias, stiffness, and fatigue. Dr. Harper again noted multiple tender muscles, particularly from the Plaintiff's neck down her back into her hips. Dr. Harper also indicated that the Plaintiff continued to suffer typical fibromyalgia symptoms which were complicated by lateral epicondylitis. (Tr. 908-909).

Dr. Harper noted on September 10, 2013, that the Plaintiff continued to experience diffuse myalgias, stiffness, and fatigue with rib pain, especially the left anterior side. Dr. Harper found tenderness of the Plaintiff's paracervical musculature, the trapezius muscles, the medial scapular border areas, the upper back, the lower back L1 to L5 bilaterally, and gluteal and lateral hip areas bilaterally. Dr. Harper also indicated that the Plaintiff had exquisite tenderness of the left chest wall just beneath her left breast. Although she had worked at losing a dramatic loss of weight over several

years' time, Dr. Harper stated that she continued to be quite symptomatic with the fibromyalgia, especially this visit with rib pain. On October 16, 2013, Dr. Harper completed a questionnaire at the request of the Social Security Administration, in which he stated that the Plaintiff had depression for which she was taking Xanax. He felt the Xanax helped, but she still experienced poor attention and concentration and poor memory. Dr. Harper felt that the Plaintiff had obvious work-related limitation due to mental condition. (Tr. 986-988).

The Plaintiff again saw Dr. Frank Harper on December 30, 2013, and she reported diffuse myalgias, stiffness, fatigue, and rectal fissure that seemed to have also aggravated her fibromyalgia. She also had right elbow pain laterally. Dr. Harper found the same tender points in her neck, back, and hips, as well as tenderness of the lateral epicondyle on the right. Ultrasound images of the right elbow confirmed lateral epicondylitis. He suggested conservative measures for the right elbow, including elbow bracing, and indicated that the rectal fissure appeared to be a significant problem that may ultimately require surgery and the severe pain from it was aggravating the fibromyalgia. (Tr. 1038-1039, 1044-1045).

The Plaintiff returned to Dr. Harper on March 10, 2014, with the same reports of continued pain, weight gain, and a sedentary lifestyle. Dr. Harper's findings were similar to his previous examinations. On June 9, 2014, Dr. Harper noted that Dr. Price's three sequential elbow injections had helped somewhat with the Plaintiff's right elbow pain, but she still had diffuse myalgias, stiffness, fatigue, and weight gain. She also had developed deep muscle pain and persistent plantar fascial pain bilaterally, as well as constipation-associated irritable bowel symptoms with pain and occasional explosive diarrhea. Dr. Harper found the same tender points in her neck, back, and hips, and he noted tenderness in her heel pads bilaterally. (Tr. 1070-1075).

At her July, 2014, visit with Dr. Harper, his findings were the same as previous visits; and

-12-

he was concerned about her relatively rapid weight gain and her going back to a previous state of extremely poor health. On October 1, 2014, the Plaintiff reported a weight loss of 5 pounds with continued diffuse myalgias, stiffness, and fatigue. Dr. Harper found tender points in her neck, shoulders, upper back, lower back, glutes, and bilateral hips. (Tr. 1065-1068).

## C.    The Administrative Proceedings

### 1.      The Administrative Hearing

At the time of her first hearing on December 13, 2011, the Plaintiff was fifty years old, with her birthday being on November 23, 1961. She graduated high school and has a driver's license. The Plaintiff last worked in July 2010 as an office manager for eight years in a doctor's office. She described her pain level as becoming severe and the stress of the job was exacerbating her pain, so Dr Harper recommended that she file for disability and stop working. When driving, she needs to take breaks every thirty minutes to get out and walk around due to spasms. The Plaintiff had lost thirty pounds in the year prior to this first hearing in an attempt to relieve pain, but she felt that there had not been much improvement in her pain. (Tr. 27-28).

The Plaintiff testified that Dr. Harper is her treating doctor, and his specialty is in rheumatology. He has been her treating rheumatologist since the early 2000's, and she sees him every one to two months. Since coming out of work, the Plaintiff indicated that Dr. Harper has never released her to return to work again. Dr. Harper is treating her for fibromyalgia, chronic pain, fatigue, muscle aches, low back pain, and neck pain. She also has osteoarthritis, particularly in her hands and fingers. She described having severe, diffuse body pain, especially in her neck, shoulder, lower back, thighs, and legs. She felt that her neck pain is constant and feels like a burning, deep, achy pain. She had previous left rotator cuff surgery in 2009, and she improved some after the surgery, but continues to have pain in her left shoulder. She indicated that her right shoulder pain feels like it is radiating

-13-

from her neck. She has constant pain in both shoulders, but her left shoulder is worse than her right. She is right-handed. She described her low back pain as being a constant ache and located right below her belt line. The pain runs across her back into both hips and buttocks down the outside of her legs down to her knees. She uses medication, heat, and ice to try to relieve her pain. She takes Vicodin two to three times daily for pain relief, Celebrex once daily, and two Tylenol or Aleve in between Vicodin doses, usually in mid-morning and mid-afternoon. She also uses ice packs numerous times daily and at night, as well as heating pads daily. She has also been prescribed a TENS unit to help with her pain, and she uses it at least twice daily for 30 to 45 minutes each time. In an attempt to reduce her pain, she also described lying down five to six times daily on the couch or in the bed with an ice pack or heating pad for 30 to 45 minutes each time. (Tr. 32-38, 45).

When the Plaintiff appeared at her second hearing on November 20, 2014, she was fifty-three years old, and she continued to have chronic pain in her shoulders, legs, and hips due to fibromyalgia. She also continued to suffer with migraine headaches, bilateral foot pain due to heel spurs, and back and shoulder pain. She did not feel that she had improved at all since her first hearing in December 2011. Dr. Frank Harper continued to be her treating rheumatologist, and he had been treating her since approximately 2000. She testified that Dr. Harper spends 30 minutes to one hour with her at each office visit and he had been treating her for fourteen years; therefore, he is the doctor who knows her condition the best. At the time of the second hearing, the Plaintiff was only being treated by Dr. Harper, unless she required injections for flare-ups of pain in her heels or elbows. Dr. Harper gives her trigger point injections three to four times each year when her pain is the most severe. (Tr. 497-501).

The Plaintiff testified that the pain in her arms and shoulders is excruciating and feels like a burning and like she is in a vice. Her legs throb; both elbows hurt with the left being worse than

the right; and there is never a time that she is able to get rid of her pain. She described the pain from fibromyalgia as feeling like a hard, deep squeezing pain that is a burning, throbbing, deep muscle pain. She also has osteoarthritis with pain in her hands, feet, knees, arms, hands, and wrists. The pain in her arms, hands, and wrists causes difficulty gripping, holding, and grasping objects such as cups, bottles, pots, and opening jars. She has trouble standing and walking for more than one hour and trouble sitting for periods of time due to pain and due to a chronic anal fissure that has been exacerbated by irritable bowel syndrome. She takes Tylenol and Aleve for pain, but both cause her gastrointestinal problems. She also takes Vicodin, and she wears a Lidoderm patch four to five days weekly. The Plaintiff also described rotating ice and heat daily for pain, and wearing a TENS unit several times daily on the parts of her body where the pain is most severe, such as her shoulders, legs, and lower back. She also lies down on the bed or couch or sits in the recliner to try to relieve her pain during the day. She takes Savella for fibromyalgia, and uses Topamax and Maxalt for migraine headaches. She takes Xanax for anxiety, which helps some with anxiety, but it does not get rid of her pain. The Plaintiff testified that Dr. Harper had tried her on numerous medications over the years, but she is unable to tolerate many medications due to the side effects she experiences. Her current medication makes her feel constantly tired. She further described being unable to read because she cannot focus and keep up with what she is reading. She indicated that this had remained a problem since the first hearing. She is unable to concentrate well enough to read a book. (Tr. 502-512).

    **2.**    **The ALJ's Decision**

    In the decision of February 27, 2015, the ALJ made the following findings of fact and conclusions of law:

    1.    The claimant meets the insured status requirements of the Social Security Act

through December 31, 2015.

2.    The claimant has not engaged in substantial gainful activity since her alleged onset date of July 1, 2010 (20 CFR 404.1571 et seq.).

3.    The claimant has the following severe impairments: degenerative disc disease; degenerative joint disease of the left shoulder; heel pain of uncertain etiology; fibromyalgia; and right elbow epicondylitis (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work (describing as requiring lifting and carrying up to ten pounds occasionally and lesser amounts frequently, sitting for 6 hours in an 8-hour day, and standing and walking occasionally (2 hours in an 8-hour day)) with occasional crawling, but no climbing ladders.  The claimant is also limited to frequent overhead reaching with the bilateral upper extremities and frequent handling with the right upper extremity.

6.    The claimant is able to perform past relevant work as an officer manager (Dictionary of Occupational Titles (DOT) # 169.167-034, described by the vocational expert as sedentary skilled work) and a courthouse clerk (DOT # 243.362-010, described by the vocational expert as sedentary skilled work as generally performed, but light as performed by the claimant).  This work does not require work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from July 1, 2010, the alleged onset date, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 476-83).

## II. DISCUSSION

The Plaintiff argues that the ALJ erred in his decision, and that reversal and remand are appropriate in this case.  Although she does not label her arguments separately, she argues that the ALJ's February 27, 2015, decision was inconsistent with his February 17, 2012, decision with

respect to Plaintiff's mental limitations; the ALJ ignored the Appeals Council's order that he consider how Plaintiff's back impairment would combine with Plaintiff's fibromyalgia to impact her RFC; the ALJ failed to address inconsistencies between the DOT and the Vocational Expert's testimony regarding the sit/stand option and the limitation regarding overhead reaching; the ALJ failed to consider Plaintiff's impairments in combination; the ALJ failed in discounting the opinion of Plaintiff's treating physician; and the ALJ failed in evaluating Plaintiff's credibility.

The Commissioner argues that the ALJ's decision is supported by substantial evidence.

## A.    LEGAL FRAMEWORK

### 1.    The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. See, e.g., Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or

equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from

performing PRW;[3] and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R.

§ 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's

disability analysis. If a decision regarding disability may be made at any step, no further inquiry is

necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled

or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is

customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R.

Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the

burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d) (5).

Once an individual has made a prima facie showing of disability by establishing the inability

to return to PRW, the burden shifts to the Commissioner to come forward with evidence that

claimant can perform alternative work and that such work exists in the regional economy. To satisfy

that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs

---

[2]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); see Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3]In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

-18-

available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir.2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. Hall v. Harris, 658 F.2d 260, 264–65 (4th Cir.1981); see generally Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (regarding burdens of proof).

> ### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. See id.; Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Walls, 296 F.3d at 290 (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." Vitek v. Finch, 438 F.2d 1157, 1157–58 (4th Cir.1971); see Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir.1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390, 401; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. See Vitek, 438 F.2d at 1157–58; see also Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should

the court disagree with such decision." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.1972).

## B.     ANALYSIS

Plaintiff argues that the ALJ erred in several ways, including by discounting the opinion of Dr. Frank Harper, Plaintiff's treating rheumatologist. The ALJ stated that he "considered Dr. Harper's opinions, but did not allow them significant evidentiary weight as they are not supported by the other medical evidence of record including Dr. Harper's progress notes." (Tr. 481). The Social Security Administration's regulations provide that"[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1508 and § 404.1527(c)(2). The medical opinion of a treating physician is entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ must apply all

of the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p; Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).

Dr. Harper, Plaintiff's rheumatologist for over twelve years, completed three Physical Capacity Evaluations (Tr. 411, 469, 1064) and two Clinical Assessments of Pain (Tr. 468, 1063). On September 30, 2011, Dr. Harper opined that the Plaintiff could lift and carry 1 pound frequently and 5 pounds occasionally; she could sit 1 hour in an eight-hour work day; could stand or walk 1 hour in an eight-hour work day; she could occasionally perform pushing/pulling movement (arm and/or leg controls), climb (stairs or ladders), balance, perform gross manipulation (grasping, twisting, and handling), perform fine manipulation (finger dexterity), bend, stoop, reach (including overhead), operate motor vehicles, and work with or around hazardous machinery. He further felt that the Plaintiff would be absent from work more than four days per month, and her restrictions were due to chronic pain. (Tr. 411).

He completed a second Physical Capacities Evaluation dated November 16, 2011, in which his opinion from the September 30, 2011, evaluation remained essentially unchanged, except he indicated that the Plaintiff could never work with or around hazardous machinery, and she would miss more than four days monthly from work. He felt that these restrictions were based on chronic severe fibromyalgia and that this level of severity had existed since July of 2010. (Tr. 469).

Dr. Harper completed another Physical Capacity Evaluation dated July 8, 2014, wherein he

-21-

opined that the Plaintiff could lift and/or carry 5 pounds occasionally and 1 pound frequently; she may sit 1 hour in an 8-hour work day; she may stand or walk 1 hour in an 8-hour work day; she can occasionally push and pull (arm and/or leg controls), climb (stairs or ladders), balance, perform gross manipulation (grasping, twisting, and handling) and fine manipulation (finger dexterity), bend and/or stoop, reach (including overhead), operate motor vehicles, and work with or around hazardous machinery. She is likely to miss more than four days per month as a result of her impairments or treatment for her impairments. Dr. Harper indicated that the medical basis for these restrictions is fibromyalgia and chronic pain. (Tr. 1063-1064).

On October 3, 2011, Dr. Harper completed a Clinical Assessment of Pain, in which he stated that the Plaintiff's pain was present and found to be intractable and virtually incapacitating; physical activity such as walking, standing, bending, sitting, stooping, and moving of the extremities greatly increased pain and to such an extent as to cause distraction from tasks or total abandonment of task; and drug side effects could be expected to be severe and to limit effectiveness due to distraction, inattention, and drowsiness. (Tr. 468).

On July 8, 2014, Dr. Frank Harper completed another Clinical Assessment of Pain, in which he stated that the Plaintiff's pain was present and found to be intractable and virtually incapacitating this individual. Physical activity, such as walking, standing, sitting, bending, stooping, moving of extremities, greatly increased her pain and to such a degree as to cause distraction from tasks or total abandonment of task. Dr. Harper also felt that side effects of the Plaintiff's prescribed medication can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc. (Tr. 1063).

In addition, on June 23, 2014, Dr. Harper wrote a letter in which he stated that the Plaintiff

was under his care for an arthritic condition that left her unable to sit or stand for greater than 20 minutes. He determined that she was medically unfit for jury duty. (Tr. 1069).

The ALJ discussed Dr. Harper's medical opinions and stated,

> I considered Dr. Harper's opinions, but did not allow them significant evidentiary weight as they are not supported by the other medical evidence of record including Dr. Harper's progress notes. For example, Dr. Harper reported in June 2014, that although the claimant's physical examination revealed tenderness of the paracervical musculature, the trapezius muscles, the medial scapular border areas, the upper back, the lower back, and the gluteal and lateral hip areas bilaterally, she had no signs of active joint inflamation of the upper or lower extremities and full range of motion of the joints. (Exhibt 45F, pages 6-7) In addition, as previously mentioned, the claimant's earlier consultative examination[4] revealed very little in the way of positive findings.

(Tr. 481).

Plaintiff argues that the ALJ's reliance on a lack of "positive findings" to discredit Dr. Harper's opinion is improper. A lack of objective findings "says relatively little about the severity of [Plaintiff's] fibromyalgia" because, as Plaintiff notes, there is no objective test for fibromyalgia. Ellis v. Colvin, No. 5:13-cv-43, 2014 WL 2862703, *8 (D.W.Va. June 24, 2014). Fibromyalgia is

---

[4]The consultative examination to which the ALJ refers was conducted by Dr. Hariett Steinart on February 7, 2011. (Tr. 259-262). The Plaintiff reported diffuse body pain, especially in her neck, lumbar spine, bilateral foot pain due to plantar fasciitis, left worse than right, and left shoulder pain. At the time of the examination, the Plaintiff was five feet five inches tall, weighed 200 pounds, and had a blood pressure of 145/95. Dr. Steinert found that the Plaintiff presented in no acute distress. She observed that the claimant was able to get on and off the examination table without difficulty, did not have any difficulty getting items into and out of her purse, and was able to walk across the room without an assistive device. She found that Plaintiff lacked a full range of motion in her left shoulder, she had left shoulder rotator cuff tenderness, she had complaints of pain with movement of her hips, she had diffuse tenderness to touch over multiple muscles in her body. Dr. Steinert indicated that the Plaintiff walked with a limping gait, she could not walk on her heels, she was tender to touch on both sides of the bottom of her heels, and she could not squat down. Dr. Steinert diagnosed fibromyalgia, irritable bowel syndrome, chronic neck and lumbar spine pain, bilateral plantar fasciitis, and status post left rotator cuff tear. With respect to "limitations of ADL's and work activity" Dr. Steinert noted that Plaintiff "has pain in her neck, lumbar spine and both heels. She has pain in her muscles and bones." (Tr. 261-262).

largely a diagnosis of exclusion based in part on the absence of objective signs, aside from the presence of "trigger" or "tender" points. Johnson v. Astrue, 597 F.3d 409, 413 (1st Cir.2009) (noting that a lack of objective findings "is what can be expected in fibromyalgia cases"). Dr. Harper consistently found numerous tender points on Plaintiff over the course of his treatment of her (Tr. 210-225, 316-321, 412-467, 908-950, 987-989, 1044-1045, 1065-1068, 1070-1075), including in the one progress note on which the ALJ relies for his finding that Dr. Harper's notes are inconsistent with his opinions. (Tr. 1070-1071). The ALJ points to the fact that in June of 2014, Dr. Harper found no active signs of joint inflamation of the upper or lower extremities and full range of motion of the joints. (Tr. 481). However, "fibromyalgia patients typically manifest normal strength, neurological reactions, and range of motion." Tucker v. Astrue, No. 5:11cv000137, 2013 WL 1211583, at *4 (W.D.Va. Mar. 1, 2013) (citing Preston v. Sec'y of Health & Human Services, 854 F.2d 815, 819–20 (6th Cir.1988))), report and recommendation adopted, 2013 WL 1196672 (W.D.Va. Mar. 25, 2013). The lack of objective findings with respect to Plaintiff's fibromyalgia is an insufficient reason to discount the opinion of the specialist who has been treating Plaintiff for over ten years for the same condition. Social Security Ruling 12-2p indicates the treating physician's opinion is the best evidence for determining the extent of a claimant's fibromyalgia symptoms. See SSR 12-2p, 77 Fed. Reg. at 43,642 ("When a person alleges FM [fibromyalgia], longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment."). Dr. Harper's opinions are particularly relevant given the fact that he is a rheumatologist because "[f]ibromyalgia is a rheumatic disease[,] and the relevant specialist is a rheumatologist." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996) (criticizing the ALJ for rejecting the value of the medical opinions of the

-24-

plaintiff's treating rheumatologist).

In addition, the ALJ chose one of Dr. Harper's progress notes out of numerous visits over the course of twelve years to give his opinion little weight. Social Security Ruling 12-2p explains how the Commissioner considers fibromyalgia in the five-step sequential evaluation process–including the RFC assessment–for determining disability. Smith v. Colvin, No. 1:14-CV-04400-RBH, 2016 WL 1089302, at *5 (D.S.C. Mar. 21, 2016). It provides, in relevant part, "[f]or a person with [fibromyalgia] we will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have "'bad days and good days.'" SSR 12-2p, 77 Fed. Reg. 43,643-44 (July 25, 2012), available at 2012 WL 3104869. In any context, relying on one progress note out of years' worth of notes amounts to improper cherry-picking, see Ellis v. Colvin, 5:13-cv-0043, 2014 WL 2862703 (W.D.Va. June 24, 2014) (noting that an ALJ may not cherry-pick trivial inconsistencies between a treating physician's opinion and the record), but it is even more troubling in the fibromyalgia context because of the very waxing and waning nature of the disease. See Eller v. Colvin, No. 1:14CV493, 2015 WL 4489479, at *6 (M.D.N.C. July 22, 2015).

Further, the consultative examination relied upon by the ALJ is not inconsistent with Dr. Harper's opinion. Dr. Steinert found diffuse tenderness to touch over multiple muscles in Plaintiff's body. (Tr. 262). In addition, in the section entitled "limitations of ADL's and work activity," Dr. Steinert stated "[s]he has pain in her neck, lumbar spine, and both heels. She has pain in her muscles and bones," (Tr. 262) which is not inconsistent with Dr. Harper's opinion that Plaintiff's pain caused distraction from tasks or total abandonment from tasks. (Tr. 468, 1063). Finally, the referral to Dr. Steinert was for an orthopedic exam. (Tr. 261). The ALJ's reliance on the statement of a physician

-25-

who is not a rheumatologist, nor Plaintiff's treating physician, is a "fact of special significance given

the unique nature of fibromyalgia."  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 245 (6th

Cir.2007); see also Stahlman v. Astrue, No. 3:10-CV-475, 2011 WL 2471546, at *6 (E.D. Va. May

17, 2011), report and recommendation adopted, No. 3:10CV475, 2011 WL 2470249 (E.D. Va. June

21, 2011).[5]

    In sum, the ALJ has failed to point to substantial evidence to support his decision to deny the

opinion of Dr. Harper significant evidentiary weight.  "A necessary predicate to engaging in

substantial evidence review is a record that adequately explains the ALJ's findings and reasoning.

Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). Accordingly, remand is necessary for a

thorough review of Plaintiff's treating physician's opinion, including, if appropriate, sufficient

explanations for discounting said opinion in accordance with the Social Security rules, regulations,

and case law.  Because the undersigned finds that the ALJ's failure to properly analyze the opinions

of Plaintiff's treating physician requires remand, a discussion of Plaintiff's remaining allegations of

error is unnecessary.  However, upon remand, the ALJ should take into consideration Plaintiff's

---

    [5]Dr. Harper also opined that the side effects of the Plaintiff's prescribed medication can
be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc.
(Tr. 1063).  Even though the ALJ recognized that this was a problem by stating "the claimant has
encountered some difficulties with medication side effects," (Tr. 479), he did not address the
effect these difficulties would have on Plaintiff's concentration, persistence or pace.  Upon
remand, the ALJ should discuss the side effects of Plaintiff's medication along with his
consideration of Dr. Harper's opinion. Further, although the ALJ found that Plaintiff had "heel
pain of uncertain etiology" (Tr. 476), there are numerous references in the medical records by
various doctors to a diagnosis of Plantar Fasciitis.  (Tr. 228, 261, 299-301, 316-17, 416-17, 1061-
62).  The ALJ should consider this and other conditions, both severe and non-severe, in
combination, reconsider her credibility, if necessary, and reassess her RFC, as he navigates
through the sequential process.

remaining allegations of error.[6]

### III. CONCLUSION

In conclusion, it may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented. Pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), it is **ORDERED** that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be REMANDED to the Commissioner for further administrative action as set forth above.

 s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

September 29, 2016
Florence, South Carolina

---

[6]As set forth above, Plaintiff argues that the ALJ's February 27, 2015, decision was inconsistent with his February 17, 2012, decision with respect to Plaintiff's mental limitations; the ALJ ignored the Appeals Council's order that he consider how Plaintiff's back impairment would combine with Plaintiff's fibromyalgia to impact her RFC; the ALJ failed to address inconsistencies between the DOT and the Vocational Expert's testimony regarding the sit/stand option and the limitation regarding overhead reaching; the ALJ failed to consider Plaintiff's impairments in combination; the ALJ failed in discounting the opinion of Plaintiff's treating physician; and the ALJ failed in evaluating Plaintiff's credibility.